IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| **DOMINICK ARCHIELD,** | 2:26-cv-2231-DCN-PJG |
| *Plaintiff,* | |
| v. | **COMPLAINT** |
| | **(Jury trial demanded)** |
| **CITY OF NORTH CHARLESTON; GEORGE VANTINE, JR.; and SIMON ANDREWS** | |
| *Defendant.* | |

## PRELIMINARY STATEMENT

1.  Plaintiff Dominick Marquis Archield brings this action under 42 U.S.C. § 1983 and the laws of the State of South Carolina against the City of North Charleston ("City"), Detective George Robert Vantine, Jr. and Detective Simon Andrews in their individual capacities.

2.  Plaintiff was wrongfully prosecuted by the City for a 2019 homicide and a 2020 attempted homicide that he did not commit, was incarcerated continuously from November 2020 until November 2024, and ultimately had all charges dismissed by the Solicitor on November 27, 2024, after the State conceded it could not convict Plaintiff based on the available evidence.

3.  This case is not the ordinary wrongful prosecution case in which the case theory turned out, in hindsight, to have been thin. It is a case in which North Charleston Police Department ("NCPD")'s own lead detective, in his own contemporaneous written supplemental report, documented an alternative motive for the homicide of Denali Berries (witness retaliation against Ms. Berries for her status as the 9-1-1 caller and witness in an unrelated Charleston Police Department homicide that had occurred approximately a month earlier) and then, in the very same report, recommended Plaintiff's arrest. He did not disclose the alternative-motive theory in his warrant affidavit.

4.  The pattern continued in the second prosecution. Detective Vantine swore both

arrest warrants on the Spann attempted-murder charges on November 8, 2020. The warrant affidavits recited a single-photo identification by a hospitalized victim who knew Plaintiff personally, omitted that the victim had not reported the shooting for approximately a week, omitted that no 9-1-1 call had been made the night of the shooting, omitted that the daylight-savings-time rollover that night cast doubt on NCPD's entire timeline, and omitted that the victim had pending felony charges of his own that created a powerful incentive to cooperate with NCPD. The State has since acknowledged, in writing, that NCPD's timeline was wrong; that medical and dispatch records the Solicitor obtained establish that the victim was already at the hospital when Plaintiff's phone registered in the area; that the cell-site warrant was executed eight days too late to capture the exculpatory data; that no firearm was ever recovered; that no projectile was ever removed from the victim for ballistics comparison; that no search warrant was ever executed on Plaintiff's residence or vehicle; and that the body-camera recordings of the bedside identification, the recorded reenactment at the victim's home, and the recorded interview of the victim's sister were not preserved by NCPD.

5.  Both investigations were led by Defendant Vantine, whom the City had already disciplined for "Failure to Supervise" and demoted by written letter from then-Chief Reggie L. Burgess (now Mayor of the City of North Charleston) in February 2018, before the events of this case.

6.  Defendant Vantine's pattern of substandard investigations is further documented by the federal civil rights lawsuit *Hodge v. City of North Charleston*, No. 2:20-cv-02560-DCN-MGB (D.S.C.), and by NCPD's own Internal Complaint Report IN2025-010, completed in March 2025, finding "a total lack of proper, thorough and complete investigation" in his case files. The City's decision to retain Defendant Vantine in the Detective Bureau and to assign him to serious felony investigations after putting him on written notice for supervisory failure — and its

failure to enforce its own written policies governing custodial-interrogation recording, evidence collection, and criminal investigations — directly produced the constitutional violations Plaintiff suffered.

7. Plaintiff seeks compensatory and punitive damages, attorneys' fees and costs under 42 U.S.C. § 1988 and South Carolina law, and such other relief as this Court deems just and proper.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over Plaintiff's federal claims pursuant to 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments to the United States Constitution.

9. The Court has supplemental jurisdiction over state law claims arising from the same facts as the federal claims, pursuant to 28 U.S.C. § 1367.

## PARTIES

10. **Plaintiff Dominick Marquis Archield** is a citizen and resident of South Carolina. At all times relevant to this Complaint, he was a resident of North Charleston, South Carolina.

11. **Defendant City of North Charleston** (the "City") is a municipal corporation organized under the laws of the State of South Carolina. The City operates the North Charleston Police Department. Pursuant to S.C. Code Ann. § 15-78-70, the City is statutorily liable for the acts and omissions of its employees acting within the course and scope of their employment, including the law-enforcement officers named below. The City is a "person" for purposes of 42 U.S.C. § 1983 to the extent its policies, customs, and practices caused the constitutional violations alleged in this Complaint. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

12. **Defendant George Robert Vantine, Jr.** ("Defendant Vantine"), upon information and belief, is a citizen and resident of South Carolina. At all times relevant to this case, Defendant Vantine acted under color of state law and within

the course and scope of his employment as a sworn law-enforcement officer of the North Charleston Police Department. He is sued in his individual capacity for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

13. **Defendant Simon L. Andrews** ("Defendant Andrews"), upon information and belief, is a citizen and resident of South Carolina. At all times relevant to this case, Defendant Andrews acted under color of state law and within the course and scope of his employment as a sworn law-enforcement officer of the North Charleston Police Department. He is sued in his individual capacity for compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

## Background and procedural history

14. On August 12, 2019, Plaintiff was arrested by NCPD on charges of Murder relating to the death of Denali Berries, which occurred in the early-morning hours of July 20, 2019, in North Charleston, near the establishment known as the "Lovey Dovey" bar.

15. Plaintiff was initially denied bond on October 18, 2019.

16. Following a motion to reconsider bond filed January 3, 2020, Plaintiff's bond was set on March 6, 2020, at $70,000 surety with conditions including a 6:00 p.m. to 6:00 a.m. curfew, six months of house arrest, and "good behavior."

17. On November 9, 2020, while Plaintiff was on bond on the murder charge, NCPD arrested him a second time on charges of Attempted Murder and Possession of a Weapon During the Commission of a Violent Crime, arising out of the November 1, 2020, shooting of Deangelo Spann.

18. On November 12, 2020, the State moved to revoke Plaintiff's bond on the original murder charge, citing the new arrest.

19. On December 16, 2020, the motion to revoke was granted, and Plaintiff remained incarcerated for years until his case was dismissed.

20. After numerous trial-docket settings and continuances, on November 27, 2024, the Ninth Judicial Circuit Solicitor filed a written Memorandum in Support of Dismissal (the "Dismissal Memo"), dismissing both prosecutions "with leave to restore."

21. The Dismissal Memo expressly stated that "the State lost confidence in the sufficiency of the evidence" and that "it is at this time not possible for the State to prove these charges beyond a reasonable doubt."

22. The favorable termination of Plaintiff's prosecution on November 27, 2024, was for reasons indicative of innocence.

23. Plaintiff was deprived of his liberty during pretrial detention and house arrest.

24. During Plaintiff's confinement and prosecution, he lost employment, suffered emotional and reputational damages, and was deprived of the support and companionship of his family.

**The Berries homicide investigation against Plaintiff was materially flawed and lacked probable cause.**

25. In the early-morning hours of July 20, 2019, Denali Berries was shot and killed on Carner Avenue near the "Lovey Dovey" bar. NCPD officers initially believed the incident to be an automobile-vs.-pedestrian accident.

26. NCPD's investigation, conducted by Defendants Andrews and Vantine and other NCPD officers, produced the following evidence used to support the subsequent arrest of Plaintiff, all of which was subsequently shown to be either non-corroborative, exculpatory, or recanted:

    a. A single eyewitness, identified in the Solicitor's Dismissal Memo as "Witness #1," Terry Anderson, a worker at the "Lovey Dovey" bar, who placed a 9-1-1 call and reported observing a white Dodge Charger drive by, the passenger exit, and shoot the victim. Mr. Anderson identified the passenger as "Bling," a person he identified as Plaintiff. Mr. Anderson has

since provided a full videotaped recantation to the Public Defender's Office, which the Solicitor has acknowledged renders Mr. Anderson's credibility "not viable."

b.    A second witness ("Witness #2"), interviewed on August 8, 2019. Witness #2 stated he did not see the shooter's face but reported community speculation that Plaintiff was the shooter and that the shooter's build matched Plaintiff's. Witness #2 refused to sign a photographic lineup identifying Plaintiff. The Solicitor has expressly acknowledged that Witness #2's testimony, standing alone, would not have permitted a successful prosecution.

c.    A third witness, Daquan Brown, who was walking with Ms. Berries on the night of the shooting. Mr. Brown's identification of Plaintiff as the shooter was qualified, in Mr. Brown's own recorded words: he stated that a man he had seen at "Bossez" the weekend following the shooting "look like" the person who had shot Ms. Berries. Defendant Andrews's supplemental report nonetheless characterized Mr. Brown's qualified statement as supporting probable cause.

d.    On July 22, 2019, Plaintiff consented to a search of his white Dodge Charger. NCPD recovered a 9-millimeter firearm and collected tire impressions for comparison to the crime scene. FBI Laboratory analysis excluded three of the four tires; the fourth was inconclusive. Test-firing of the 9-millimeter firearm conclusively excluded it as the source of the shell casings recovered at the scene of the homicide. There is no forensic evidence linking Plaintiff to the Berries homicide.

e.    Cell-site location data for Plaintiff's cellular phone was non-dispositive. As the Solicitor has acknowledged, the phone routed "through the exact same sector and towers that is used over 60% of the time for the 3-month period

surrounding the Murder." Plaintiff resided in the immediate vicinity where the homicide occurred. The cell-site data could not place Plaintiff at the scene any more than it could place him at his own home.

f.   Oniqua Hamilton, interviewed by Defendant Andrews on August 14, 2019, provided alibi-related information including her account that "Bling was driving his car," his own white Dodge Charger, openly. A separate alibi witness (the Solicitor's "Witness #3") told investigators they were with Plaintiff on the evening of the homicide.

g.   Plaintiff made no incriminating statement at any time, having invoked his right to counsel.

**NCPD's lead detective documented an alternative-motive theory of witness retaliation four days before Plaintiff's arrest and suppressed it.**

27.   Prior to the homicide of Denali Berries, an unrelated homicide occurred in the City of Charleston: the murder of Bryan Cozart at 73 Harris Street in downtown Charleston.

28.   The Cozart homicide was investigated by the Charleston Police Department ("CPD"), not by NCPD.

29.   CPD investigative records reflect that Denali Berries was the 9-1-1 caller who reported the Cozart shooting.

30.   CPD records further reflect that Ms. Berries was interviewed multiple times by CPD detectives in the days following the Cozart murder, that she was openly discussing her status as a witness to the events surrounding the Cozart murder, and that her information was material to the CPD investigation.

31.   On August 8, 2019, Defendant Andrews interviewed Marvin Myers, Plaintiff's uncle. Defendant Andrews memorialized the interview in a contemporaneous supplemental investigative report.

32.   In that supplemental report, Defendant Andrews recorded that Mr. Myers told him

that the victim Berries "got killed because [she] was testifying" in a "downtown" murder, and that "[she] was supposed to have to go to court."

33. This statement, made by a member of Plaintiff's own family four days before Plaintiff's arrest, identified the actual motive for the Berries homicide as witness retaliation; a motive that necessarily implicated a suspect pool other than Plaintiff.

34. Despite the evidence pointing to an alternative motive (witness retaliation), an alternative suspect pool (those connected to the Cozart homicide), and material weakness in the identifications then available to NCPD, Defendant Andrews concluded the same supplemental report by stating: "Arrest Warrants for Murder and Possession of a Firearm during the Commission of a Violent Crime will be obtained."

35. Plaintiff was arrested four days later, on August 12, 2019.

36. Upon information and belief, neither Defendant Andrews nor any other NCPD officer disclosed the witness-retaliation motive theory, the Cozart-investigation cross-reference, or the impeachment information regarding Mr. Anderson's identification until the supplemental report was produced in October 2019 Rule 5 discovery.

37. The arrest warrant affidavits and presentation were materially incomplete by reason of these omissions.

**NCPD officers refused to examine exculpatory Facebook video evidence brought to City Hall by Plaintiff's family.**

38. In late December 2021, Iris Archield, Plaintiff's mother, was informed by an acquaintance of a publicly posted Facebook Live video by an individual named Shakima Stanley.

39. In that Facebook video, Ms. Stanley appeared to direct accusations at Devon Brown, the father of her child, stating that she had "lied for" Mr. Brown, that Mr. Brown was "the person that shot that boy," and that Mr. Brown was "the person

that was driving that white Charger."

40. Upon information and belief, Ms. Stanley was at the relevant time the registered owner of a white Dodge Charger separate from the vehicle owned by Plaintiff and was known in the community to allow Mr. Brown to operate that vehicle.

41. In or about January 1–5, 2022, Ms. Iris Archield, accompanied by her sister and Plaintiff's uncle, traveled to North Charleston City Hall to bring this exculpatory video to the attention of NCPD.

42. Upon arrival they were directed to wait by vending machines until officers came to meet them.

43. Eventually one male and one female NCPD officer (the "City Hall Officers") came to meet with Ms. Archield and her family.

44. When Ms. Archield attempted to display the Facebook videos on her cellular telephone, the male NCPD officer refused to look at the video.

45. When Ms. Archield asked to speak with the detective working on the case, the male officer told her that "there wasn't anyone working on the case" and that he could not assist her.

46. During this conversation, the male officer's captain repeatedly telephoned him. The male officer eventually answered, told the captain he was discussing Plaintiff's case, and immediately left the room and did not return.

47. The female officer told Ms. Archield that she should take the evidence to the Solicitor's Office and that they should leave.

48. Ms. Archield then attempted to deliver the evidence to the Solicitor's Office; she was told that office could not speak with her because Plaintiff was represented by counsel.

49. She gave the videos to Plaintiff's then-counsel, who indicated they were unlikely to be of assistance at that time.

50. Eventually, after Plaintiff wrote to the South Carolina Supreme Court from custody

describing the existence of the videos, the Solicitor's Office contacted Plaintiff's counsel and requested copies of the videos.

51. Upon information and belief, the videos became one of the materials reviewed by the Solicitor in deciding to dismiss the prosecution.

52. The conduct of the City Hall Officers in refusing to view, document, log, preserve, or investigate exculpatory evidence concerning a pending homicide prosecution was a violation of NCPD's own written policies governing the duty to investigate, evidence collection and preservation, and disclosure of exculpatory material.

53. This conduct deprived Plaintiff of timely access to exculpatory evidence and prolonged his deprivation of liberty.

**The sole identifying witness in the Berries homicide recanted; a separate exculpatory witness identified another person as the actual shooter.**

54. Mr. Anderson, the only person who positively identified Plaintiff as the shooter of Denali Berries, has provided a full, recorded, sworn recantation to investigators retained by the Public Defender's Office.

55. In that recantation, Mr. Anderson stated that Plaintiff was not present and did not shoot Ms. Berries.

56. The Solicitor has acknowledged in writing that, considering the recantation, Mr. Anderson's credibility is "not viable" and that the State "can no longer present" Mr. Anderson's testimony.

57. A separate witness, Kenyatta Hill, told investigators retained by the Public Defender's Office that Christopher Bradley (also known as "Chris Rivers," now deceased) was the actual shooter of Denali Berries.

58. Mr. Hill further told defense investigators that Plaintiff did not shoot Deangelo Spann.

**The Spann attempted-murder investigation was even more deficient and was premised on a daylight-savings time error that, when corrected, exonerates**

**Plaintiff.**

59. On November 1, 2020, Deangelo Spann was transported to the Roper Hospital Emergency Department in downtown Charleston to receive treatment for gunshot injuries to his head and chest.

60. Daylight-savings time ended at 2:00 a.m. on November 1, 2020, with the time changing from Eastern Daylight Time ("EDT") to Eastern Standard Time ("EST") and the 1:00 a.m. hour repeating.

61. On the night of the shooting, NCPD was not notified by 9-1-1 calls from the victim or his sister; no crime-scene response was made to the victim's residence; no physical evidence was collected; no video surveillance was retrieved; and no firearm was recovered.

62. The shooting was not reported to NCPD until November 7, 2020, approximately a week after the alleged incident.

63. On November 7, 2020, at approximately 11:59 a.m., NCPD Pfc. David Owens responded to MUSC in reference to a caller attempting to report a person being shot.

64. Officer Owens, accompanied by Officer Vincent J. DeNicola, arrived at MUSC and met with hospital security, the complainant Nicole Ikesha Bailey (Mr. Spann's family member), and Mr. Spann. Officer Owens activated his body-worn camera.

65. Lieutenant Kuechler and Sergeant Brown of NCPD responded to MUSC and interviewed Mr. Spann at his bedside. During that bedside interview, Sergeant Brown's body-worn camera recorded the interview.

66. Mr. Spann identified Plaintiff as the person who shot him.

67. A single-photo identification was prepared and signed at the bedside.

68. Following Mr. Spann's release from MUSC, NCPD investigators conducted a recorded interview at his residence in which Mr. Spann demonstrated a re-enactment of the events.

69. Investigators also conducted a recorded interview of Mr. Spann's sister, who had transported him to the hospital.

70. In willful, reckless, or grossly negligent violation of NCPD's own written policies on the recording and preservation of custodial and witness interviews, none of the body-camera footage of the MUSC bedside interview, none of the re-enactment footage at Mr. Spann's residence, and none of the recorded interview of Mr. Spann's sister was preserved by NCPD.

71. On November 8, 2020, Defendant Vantine obtained arrest warrants for Attempted Murder and Possession of a Firearm During Commission of a Violent Crime.

72. Defendant Vantine's sworn affidavits recited the victim's positive single-photo identification, the bullet holes observed at the rear of 2351 Cosmopolitan Street, and the victim's knowledge of Plaintiff.

73. The affidavits omitted the following material facts:

    a. the six-day delay between the alleged shooting and any report to NCPD;

    b. the absence of any 9-1-1 call on the night of the shooting;

    c. the absence of any immediate crime-scene response;

    d. the suggestive single-photo identification procedure;

    e. the daylight-savings-time ambiguity that called the entire timeline into question;

    f. the absence of any firearm recovered for ballistics comparison;

    g. the absence of any projectile recovered from Mr. Spann's body for ballistics comparison;

    h. the absence of any search warrant on Plaintiff's residence or vehicle; and

    i. the existence of pending felony charges against Mr. Spann that created a powerful incentive for him to cooperate with NCPD.

74. Defendant Vantine's affidavits also relied, in material part, on cell-site location records he represented as showing Plaintiff's phone in Mr. Spann's neighborhood at a time consistent with Roper Hospital's recorded "1:09 a.m." arrival timestamp for Mr. Spann.

75. NCPD had incorrectly assumed that the 1:09 a.m. timestamp was the second occurrence of the 1:00 a.m. hour following the daylight-savings rollback.

76. In fact, as additional medical and dispatch records subsequently obtained by the Solicitor confirmed:

   a. Mr. Spann was transported from Roper Hospital to MUSC between 1:05 a.m. EST and 1:27 a.m. EST on November 1, 2020;

   b. Charleston County Consolidated Dispatch records reflect a call by Roper Medical staff identifying Mr. Spann as a gunshot-injury victim at 1:05 a.m. EST; and

   c. Plaintiff's cellular phone registered in the Union Heights area *after* Mr. Spann had already been admitted to Roper and identified as a gunshot victim.

77. Compounding this investigative error, NCPD obtained the search warrant for Plaintiff's historical cell-site data long enough after the shooting that the cellular provider had purged certain location records.

78. The Solicitor has acknowledged in the Dismissal Memo that this delay irretrievably destroyed evidence that, upon information and belief, would have further confirmed Plaintiff's alibi.

**The City was on notice of Defendant Vantine's pattern of misconduct yet continued to assign him to serious felony investigations.**

79. On February 2, 2018, approximately 17 months before the events giving rise to this Complaint, Defendant Vantine was demoted by the Chief of the North Charleston Police Department because of an internal investigation that found that Defendant

Vantine "violated the department's Code of Conduct Policy in reference to Failure to Supervise."

80. Defendant Vantine's rank was reduced to Police Officer and his salary cut by 10%.

81. The findings were reduced to writing and delivered to Defendant Vantine in a letter signed by Chief Burgess.

82. Despite this finding of supervisory failure, and despite NCPD's policies establishing standards for criminal investigations, the recording and preservation of custodial interrogations, the collection and preservation of evidence, and the conduct of detective-bureau personnel, the City permitted Defendant Vantine to be reassigned to and to remain in the Detective Bureau, including assignments to serious felony investigations such as the Berries homicide and the Spann attempted-murder cases against Plaintiff.

83. The City's pattern of permitting Defendant Vantine to handle felony investigations despite documented supervisory failure resulted in further documented misconduct.

84. In or about December 2018 and continuing into 2019, Defendant Vantine, along with another NCPD detective, caused the wrongful arrest, on out-of-state warrants based on misidentification, of Melissa Hodge, a resident of Sumter County, South Carolina, who was not the person depicted in the surveillance video that gave rise to those warrants.

85. Following Ms. Hodge's actual-innocence release, the warrants were withdrawn and Ms. Hodge filed suit.

86. The Hodge complaint alleged, among other things, that Defendant Vantine and a co-detective "supplied false information and omitted exculpatory material information in the warrant affidavit" for Ms. Hodge's arrest.

87. This conduct was materially indistinguishable from the conduct alleged in this Complaint.

88.  Following the dismissal of Plaintiff's prosecutions, NCPD's own internal-affairs office again documented Defendant Vantine's pattern.

89.  By Internal Complaint Report No. IN2025-010 (date of occurrence December 9, 2024; date completed March 3, 2025), and following Defendant Vantine's reassignment to NCPD's Special Victims Unit, supervisors reviewed fourteen of Defendant Vantine's assigned cases and "found numerous concerns providing a total lack of proper, thorough and complete investigation in violation of NCPD Policy #A-26-IV. / D-4."

90.  The City was on further notice of the need to reform NCPD by reason of the Department of Justice's Collaborative Reform Assessment of NCPD, initiated in or about May 2016 by the COPS Office of the Department of Justice in response to community demand following the death of Walter Scott at the hands of an NCPD officer in 2015, and terminated by the Department of Justice in 2017 without public release of its findings.

91.  Calls for release of the assessment from the NAACP Legal Defense and Educational Fund, the ACLU of South Carolina, the Charleston Area Justice Ministry, the local NAACP chapter, and United States Senator Tim Scott have been refused.

92.  During the same period, NCPD was the subject of additional misconduct lawsuits and disciplinary actions, including the December 2019 excessive-force lawsuit against NCPD and its former chief, the February 2020 charges against a former NCPD officer for misconduct and obstruction, and the August 2020 Lewis excessive-force lawsuit.

93.  This pattern of misconduct and the City's knowing tolerance of it was the driving force behind the constitutional violations Plaintiff suffered.

**Damages suffered by Plaintiff**

94.  As a direct and proximate result of the Defendants' acts and omissions described above, Plaintiff suffered, and continues to suffer, severe damages, including

without limitation: deprivation of his liberty during pretrial incarceration on charges that were never supportable, together with an additional approximately eight months of house arrest; loss of employment and earning capacity, past and future; psychological and emotional injury, including anxiety, depression, and post-traumatic stress arising from his prolonged confinement and the prosecution; reputational harm in his community arising from his public association with capital and life-sentence felony charges; loss of the support and companionship of his family; legal fees and expenses; and other damages to be proven at trial.

## CAUSES OF ACTION

### Claim 1

### 42 U.S.C. § 1983 — Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

### *(Against Defendants Vantine and Andrews)*

95. Defendants Vantine and Andrews, acting individually, in concert with one another, and with others unnamed, acted knowingly, willfully, and with malice (or, in the alternative, with reckless disregard for the truth) to initiate and continue criminal proceedings against Plaintiff without probable cause to believe him guilty of the offenses charged.

96. Defendants Vantine and Andrews caused the issuance of arrest warrants and the procurement of indictments against Plaintiff (a) by supplying false or misleading information to magistrates, prosecutors, and the grand jury and (b) by omitting from those communications material exculpatory and impeachment information, including but not limited to:

    i.    Witness #2's refusal to sign a photographic lineup;

    ii.    the qualified "look like" character of Daquan Brown's identification;

    iii.    the existence of an alibi witness;

    iv.    the witness-retaliation motive theory documented in Defendant

Andrews's August 2019 supplemental report;

v.    the negative ballistics and tire-comparison results;

vi.   the daylight-savings-time error underlying the timeline of the Spann shooting; and

vii.  the existence of recorded body-camera and witness-interview footage that NCPD failed to preserve.

97.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff was seized within the meaning of the Fourth Amendment, deprived of his liberty without due process within the meaning of the Fourteenth Amendment, and suffered the damages set forth above.

98.  The criminal proceedings terminated in Plaintiff's favor on November 27, 2024, for reasons indicative of innocence.

99.  Defendants Vantine and Andrews are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for compensatory and punitive damages, and for attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Claim 2

### 42 U.S.C. § 1983 — Fabrication of Evidence and Denial of Due Process in Violation of the Fourth, Sixth, and Fourteenth Amendments

*(Against Defendants Vantine and Andrews)*

100. Defendants Vantine and Andrews, acting individually, in concert with one another, and with others unnamed, deliberately, willfully, recklessly, or with deliberate indifference to the truth, fabricated or caused to be fabricated false or misleading police reports, witness statements, warrant affidavits, and investigative narratives (collectively, the "Fabricated Evidence"), including but not limited to:

a.    representations characterizing Daquan Brown's qualified "look like" statement as a positive identification of Plaintiff as the Berries shooter;

    b.   representations concerning the inculpatory significance of cell-site location records given the daylight-savings-time error in the Spann investigation; and

    c.   the omission of material exculpatory information from the warrant affidavits and indictment papers.

101.   Defendants Vantine and Andrews forwarded, or caused to be forwarded, the fabricated evidence to prosecutors, magistrates, and grand jurors, intending and knowing that it would be used to initiate and to continue the criminal prosecutions of Plaintiff.

102.   Defendants Vantine and Andrews knew that the Fabricated Evidence, if considered by a jury at trial, would be likely to influence the jury's decision to convict Plaintiff.

103.   As a direct and proximate result of the Individual Defendants' conduct, prosecutors initiated and continued criminal prosecutions of Plaintiff, and he was deprived of his liberty in violation of the Fourth, Sixth, and Fourteenth Amendments.

104.   Defendants Vantine and Andrews are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for compensatory and punitive damages, and for attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Claim 3

### 42 U.S.C. § 1983 — Suppression of Exculpatory Evidence and Denial of Due Process in Violation of the Fourteenth Amendment

*(Against Defendants Vantine and Andrews)*

105.   At all relevant times, Plaintiff had a clearly established right under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, to the timely disclosure by law enforcement to prosecutors, and through prosecutors to the defense, of all material exculpatory and impeachment evidence in the possession, custody, or control of the prosecution team.

106. Defendants Vantine and Andrews violated this right by, among other things:

    a. failing to disclose, in the Berries homicide warrant affidavits and to the grand jury, the witness-retaliation motive theory and the Cozart-investigation cross-reference documented in Defendant Andrews's August 2019 supplemental report;

    b. failing to preserve the body-camera footage of Mr. Spann's MUSC bedside interview, the recorded re-enactment footage at Mr. Spann's residence, and the recorded interview of Mr. Spann's sister;

    c. refusing to view, document, log, preserve, or investigate the Stanley/Brown Facebook video evidence brought to NCPD by Plaintiff's family in early January 2022; and

    d. failing to disclose to prosecutors information that the cell-site location records relied on in the Spann investigation reflected a time after Mr. Spann had already been admitted to Roper Hospital, properly understood across the daylight-savings boundary.

107. Each item of suppressed or destroyed evidence was material in that there is a reasonable probability that, had it been timely disclosed and preserved, the result of the proceedings against Plaintiff would have been different.

108. In this case, the disclosure and preservation of even some of this evidence ultimately produced the dismissal of the prosecutions.

109. Defendants Vantine and Andrews are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for compensatory and punitive damages, and for attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## Claim 4

## 42 U.S.C. § 1983 — Municipal Liability Under Monell

*(Against Defendant City of North Charleston)*

110. At all relevant times, the City of North Charleston, through the North Charleston

Police Department and its final policymakers, including the Chief of Police, was responsible for the training, supervision, discipline, and retention of NCPD personnel, and for the establishment, dissemination, and enforcement of NCPD policies governing criminal investigations, custodial interrogations and their recording, the collection and preservation of evidence, the conduct of detective-bureau personnel, and the disclosure of exculpatory material to prosecutors.

111. The City of North Charleston is liable to Plaintiff under 42 U.S.C. § 1983 because the constitutional violations described in Claims 1, 2, and 3 were caused by one or more of the following municipal policies, practices, customs, and failures, each of which was the driving force behind those violations:

   a. A custom or de facto policy of permitting NCPD detectives, including Defendants Vantine and Andrews, to construct prosecution-ready cases on the basis of single-witness or qualified-identification evidence, while omitting from warrant affidavits and indictment papers material exculpatory and impeachment information including, in this case, a documented alternative-motive theory recorded in the lead detective's own supplemental investigative report;

   b. A custom or de facto policy of failing to enforce NCPD's written policies governing the recording and preservation of custodial and witness interviews, the collection and preservation of evidence, and the conduct of criminal investigations;

   c. A failure to supervise detectives in the conduct of felony investigations, notwithstanding written discipline of Defendant Vantine specifically for "Failure to Supervise" in February 2018, notwithstanding subsequent documentation of Defendant Vantine's pattern in the form of the *Hodge* litigation, and notwithstanding

NCPD's own Internal Complaint Report IN2025-010 finding "a total lack of proper, thorough and complete investigation" in his casework;

d. A failure to train NCPD personnel adequately on the constitutional limits of arrest-warrant affidavit drafting, the duty to disclose exculpatory information to prosecutors, the duty to preserve recordings of custodial and witness interviews, and the rudimentary protocols for handling crime-scene evidence in violent-crime investigations — a failure that, in light of the obvious and foreseeable consequences for citizens such as Plaintiff, constitutes deliberate indifference to constitutional rights;

e. A ratification by NCPD final policymakers of the conduct of Defendant Vantine and the other Individual Defendants by, among other things, retaining Defendant Vantine in the Detective Bureau and assigning him to felony investigations after the 2018 Failure-to-Supervise discipline, and by declining to discipline officers responsible for the failures documented in the Solicitor's Memorandum in Support of Dismissal.

112. The City was on extensive institutional notice of the need to reform NCPD's practices.

113. The Department of Justice's Collaborative Reform Assessment of NCPD, initiated in 2016 and terminated in 2017 without public release of its findings, and the additional misconduct lawsuits and disciplinary actions against NCPD officers during the same period, placed the City on notice of NCPD's pattern of constitutional violations.

114. The City's failure to remediate that pattern, including reforming detective-bureau practices and supervisory accountability, constitutes deliberate indifference to

constitutional rights.

115. As a direct and proximate result of the foregoing policies, customs, and failures, Plaintiff was deprived of his constitutional rights and suffered the damages described above.

116. Defendant City of North Charleston is liable to Plaintiff pursuant to 42 U.S.C. § 1983 for compensatory damages, and for attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## Claim 5

## Malicious Prosecution Under South Carolina Common Law

*(Against Defendant City of North Charleston, Pursuant to the South Carolina Tort Claims Act)*

117. The acts and omissions of Defendants Vantine and Andrews, all of which were committed within the course and scope of their employment as NCPD officers, constitute the South Carolina common law tort of malicious prosecution. Specifically:

   a. There were the institution and continuation of original judicial proceedings against Plaintiff by procuring the arrest warrants and indictments described above;

   b. By, or at the insistence of, Defendants Vantine, Andrews, and the North Charleston Police Department;

   c. The proceedings terminated in Plaintiff's favor on November 27, 2024, for reasons indicative of innocence;

   d. Defendants acted with malice, which may be inferred from a lack of probable cause;

   e. There was no probable cause for the prosecution; and

   f. Plaintiff suffered the damages described above.

118. Pursuant to the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-70,

Defendant City of North Charleston is liable to Plaintiff for the malicious prosecution by its employees acting within the course and scope of their employment, and is therefore liable to Plaintiff for compensatory damages subject to the statutory limits set forth in S.C. Code Ann. § 15-78-120.

**Claim 6**

**Negligent Hiring, Training, Supervision, and Retention Under South Carolina Common Law**

*(Against Defendant City of North Charleston, Pursuant to the South Carolina Tort Claims Act)*

119.   Defendant City of North Charleston owed Plaintiff a duty to exercise reasonable care in the hiring, training, supervision, and retention of NCPD personnel, including Defendants Vantine and Andrews, who exercised the City's authority to investigate, arrest, and procure the prosecution of citizens such as Plaintiff.

120.   The City of North Charleston breached that duty by, among other things:

   a.   retaining Defendant Vantine in the Detective Bureau and assigning him to serious felony investigations notwithstanding written discipline for "Failure to Supervise" in February 2018;

   b.   failing to provide adequate training to detectives concerning the constitutional and policy requirements identified in Claim 4;

   c.   failing to supervise the conduct of detectives in connection with the warrant-affidavit, evidence-preservation, and disclosure requirements identified in Claims 2 and 3;

   d.   failing to supervise NCPD personnel in their handling of citizen-provided exculpatory evidence, as exemplified by the City Hall Officers' refusal to view the Stanley/Brown Facebook video; and

   e.   failing to remediate the institutional pattern of constitutional violations of which the City had been on notice since at least 2016.

121. As a direct and proximate result of the City's breaches, Plaintiff was caused to be wrongfully arrested and prosecuted, was incarcerated for approximately four years and seven months, and suffered the damages set forth above.

122. Pursuant to the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-70, Defendant City of North Charleston is liable to Plaintiff for compensatory damages subject to the statutory limits set forth in S.C. Code Ann. § 15-78-120.

## PRAYER FOR RELIEF

Plaintiff Dominick Archield respectfully prays this Honorable Court for:

A.    Compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial;

B.    Punitive damages against the Individual Defendants in their individual capacities, in an amount to be proven at trial;

C.    Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable statute;

D.    Pre-judgment and post-judgment interest at the maximum lawful rate; and

E.    Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff asserts his rights pursuant to the Seventh Amendment to the United States Constitution and respectfully demands a trial by jury.

Respectfully Submitted,

***s/ Joshua Snow Kendrick***
Joshua Snow Kendrick (9037)
KENDRICK & LEONARD, P.C.
7 Mills Avenue (29605)
P.O. Box 6938
Greenville, SC 29606
Tel: (864) 760-4000
Josh@KendrickLeonard.com

Christopher S. Leonard (10988)
KENDRICK & LEONARD, P.C.
1516 Richland Street (29201)
P.O. Box 886

Columbia, SC 29202
Tel: (803) 667-3186
Chris@KendrickLeonard.com

Greenville, South Carolina
June 5, 2026